**Affirmed and Memorandum Opinion filed May 2, 2024.**



In The

# Fourteenth Court of Appeals

---

NO. 14-22-00281-CR
NO. 14-22-00282-CR
NO. 14-22-00283-CR

---

## CHRISTOPHER DI-MATHEW ARREAGA, Appellant

### V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 182nd District Court
Harris County, Texas
Trial Court Cause Nos. 1762750, 1685507 & 1685508**

---

## MEMORANDUM OPINION

A jury found appellant Christopher Di-Matthew Arreaga guilty of two counts of aggravated sexual assault of a child (trial-court cause number 1685507/appellate-court case number 14-22-00282-CR and trial-court cause number 1685508/appellate-court case number 14-22-00283-CR) and one count of "super" aggravated sexual assault of a child (trial-court cause number

1762750/appellate-court case number 14-22-00281-CR).[1] *See* Tex. Penal Code Ann. § 22.021(a)(1)(A)(iii), (a)(B)(iv), (a)(2)(B), (f)(2). The jury assessed punishment at imprisonment for 50 years in trial-court cause number 1762750, 35 years in trial-court cause number 1685507, and 35 years trial-court cause number 1685508.

In what we construe as four issues, appellant argues that the trial court erred by denying his motion for new trial because (1) the State presented false DNA evidence; (2) there was prosecutorial misconduct—namely, the State's failure to deliver *Brady* material and the State's avoidance of statutory notice requirements; and (3) he received ineffective assistance of counsel. Appellant also argues that (4) the evidence is legally insufficient to establish that he acted in concert with others to plan the sexual assault. We overrule appellant's issues and affirm the trial court's judgments.

## I.    BACKGROUND

One night in July 2020, at approximately 1:00 a.m., the two complainants—sisters A.R. (age 13) and E.R. (age 11)—snuck out of their house and walked to a McDonald's to meet up with a female friend—A.C. (age 12)—and hang out with some boys A.C. had met online. The two complainants had never met the boys before.

A few minutes later, appellant, his brother Bryan, and his friends Daniel Tellez and Jose Majano picked the girls up from the McDonald's parking lot in a black sedan and drove the girls to appellant's home. The boys separated the two sisters, telling E.R. to go into one bedroom and A.R. and A.C. into another; Bryan

---

[1] "Commission of the offense under subsection (f)(2), which effectively replaces the 'or' between subsection (a)(2)(A) and (a)(2)(B) with an 'and,' is . . . what the court and parties referred to as 'super' aggravated sexual assault of a child." *Moreno v. State*, 413 S.W.3d 119, 128 (Tex. App.—San Antonio 2013, no pet.).

and Majano entered the room with E.R. while appellant went into the room with A.R. and A.C.

Bryan and Majano asked E.R. to enter a closet. Majano removed E.R.'s clothes and he and Bryan orally, anally, and vaginally penetrated her with their penises. After roughly an hour, appellant entered the closet after Majano left the closet. E.R. testified that appellant instructed E.R. to perform oral sex on his brother, Bryan, who was still in the closet. E.R. claimed that after appellant and Bryan left, Tellez then entered the closet and made E.R. perform oral sex on him.

Bryan and Jose removed E.R.'s clothes and positioned her on her hands and knees. Bryan and Jose then simultaneously put their penises inside E.R.'s mouth, vagina, and anus; when she started bleeding, Bryan and Jose put a towel underneath her. Appellant then came in and told E.R. to "suck his brother's dick." Bryan's penis touched E.R.'s mouth before she was able to move away and say "no." When appellant and Bryan left the room, Daniel entered the closet and forced his penis into E.R.'s mouth. E.R. told the forensic nurse who interviewed her that the boys were filming her and showing other people the sexual assault via FaceTime.

Meanwhile, in the other room, a baby was sleeping on the bed so appellant put blankets on the floor and had A.R. lie down next to him. A.R. did not want to lie next appellant, but she did not know what to do so she eventually laid down on the blanket. Appellant then repeatedly asked A.R. to give him oral sex, and A.R. repeatedly refused. Appellant then got on top of A.R., gave her a hickey on her neck, took her pants and underwear off and put his penis inside of her vagina and anus. A.R. kept telling appellant "no," but he would not stop. A.R. noticed that appellant was recording the assault.

Eventually, the boys had the girls get back in the car. When the car stopped,

the girls exited the vehicle and called the police from the nearest gas station because the boys had taken their phones. The police found the girls' phones in an automated Walmart kiosk where they had sold the girls' phones. Security footage verified that all four of the boys walked into the Walmart later in the morning on the day of the sexual assaults.

The girls were taken to the hospital to undergo sexual assault examinations; the nurse observed a bruise on A.R.'s neck and noted several injuries to E.R.'s genitals, which were actively bleeding at the time of the examination. The police obtained a search to collect appellant's DNA, but claimed they could not obtain a search warrant for Bryan or his DNA because he was a minor. They compared appellant's DNA to the DNA discovered on the towel that was placed under E.R. during the sexual assault. The DNA analysis showed that it was seven times more likely that DNA recovered from the towel originated from E.R. and appellant rather than E.R. and an unknown individual and three times more likely that the DNA recovered from a swab of E.R.'s genitals and underwear originated from appellant and an unknown individual rather than two unknown individuals. The DNA expert explained that these results only offered limited support for the proposition that appellant was the contributor to the DNA associated with E.R.; the DNA expert also admitted that biological siblings share a higher percentage of DNA compared to other individuals. The DNA evidence linking appellant to A.R.'s underwear, however, was incredibly strong: it was approximately three trillion times more likely that the DNA mixture from the sperm fracture recovered from A.R.'s underwear originated from A.R. and appellant rather than from A.R. and an unknown individual.

Appellant argued that he did not participate in the sexual assault; instead, his DNA simply transferred to both complainants from objects in the house. The jury

4

implicitly rejected appellant's theory and found him guilty on all three offenses: two offenses of aggravated sexual assault against A.R., and one offense of super aggravated sexual assault committed against E.R. by forcing E.R.'s mouth to touch Bryan's penis and by acting in concert with Majano or Tellez, who engaged in conduct that would constitute the offense of sexual assault of E.R. during the course of the same criminal episode. *See* Tex. Penal Code Ann. § 22.021.

During the punishment phase of trial, the State presented evidence that appellant assaulted C.R.—a different twelve-year-old girl—approximately two weeks before assaulting A.R. and E.R. C.R. testified that appellant drove her to his house and sexually assaulted her; she eventually ran out of the house and walked for three hours to the nearest gas station.

Appellant was sentenced to 50 years' imprisonment on the super aggravated sex assault conviction and 35 years' imprisonment on both of the aggravated sexual assaults; the trial court ordered the sentences to run consecutively.[2] *See* Tex. Penal Code Ann. § 22.021(f)(2).

Appellant filed a motion for new trial and requested a hearing. In support of his motion, appellant attached several affidavits, including one from his DNA expert claiming that the DNA mixtures recovered from E.R.'s genitals likely originated from appellant's brother Bryan and not from appellant. Appellant also complained that he received ineffective assistance of counsel and that the State's actions regarding the DNA evidence constituted prosecutorial misconduct.

---

[2] After reviewing the reporter's record, we concluded that appellant was not properly sentenced. We abated the appeals so that the trial court could pronounce sentence in open court in each cause. *See Meachum v. State*, 273 S.W.3d 803, 805–06 (Tex. App.—Houston [14th Dist.] 2008, order) ("Following the Court of Criminal Appeals decision in *Thompson* [108 S.W.3d 287 (Tex. Crim. App. 2003)], we conclude that we lack jurisdiction over appellant's appeal based on the trial court's failure to pronounce the sentence in appellant's presence.").

After holding a hearing on the motion for new trial, the trial court signed an order denying appellant's motion for new trial. Appellant appealed.[3]

## II.    ANALYSIS

### A.    Legal sufficiency

In what we construe as his fourth issue, which we address first, appellant argues that the evidence is legally insufficient to support the jury's finding that he acted "in concert" with co-defendants. Appellant does not challenge the sufficiency of the evidence for his two convictions of aggravated sexual assault against A.R., nor does he challenge the other elements of his super aggravated sexual assault conviction.

### 1.    Standard of review and applicable law

We apply a legal-sufficiency standard of review in determining whether the evidence supports each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Under this standard, we examine all the evidence adduced at trial in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360. We consider all evidence in the record, whether admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App.

---

[3] Appellant filed three separate notices of appeals, one for each conviction. Trial court cause number 1762750, appellant's conviction for super aggravated sexual assault against E.R., correlates to appellate case 14-22-00281-CR. Trial court cause numbers 1685507 and 1685508, appellant's convictions for aggravated sexual assault of A.R., correlate to appellate cases 14-22-00282-CR and 14-22-00283-CR, respectively.

2007). We will uphold the jury's verdict unless a rational fact-finder must have had reasonable doubt as to any essential element. *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).

We do not, however, re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the witness's credibility and the weight given their testimony, we resolve any evidentiary conflicts or inconsistencies in favor of the verdict. *See Isassi v. State*, 330 S.W.3d 633, 643 (Tex. Crim. App. 2010) ("As long as the jury's finding of a culpable intent 'is supported by a reasonable inference, it is within the province of the fact-finder to choose which inference is most reasonable.'").

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge and as authorized in the indictment. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

For the offense of aggravated sexual assault, the hypothetically correct jury charge requires the jury to find that appellant intentionally or knowingly caused the penetration of the anus of another person, or caused the sexual organ of another person to contact the sexual organ of appellant, and that the victim is under the age of 14. *See* Tex. Penal Code 22.021(a)(1)(A)(i), (iii), (a)(2)(B). For the offense of super aggravated sexual assault, the hypothetically correct jury charge requires the jury to find that appellant intentionally or knowingly caused the mouth of a child under the age of 14 to contact the sexual organ of another person, and that

7

appellant acted in concert with another who engaged in conduct that would constitute an offense of sexual assault during the course of the same criminal episode. *See* Tex. Penal Code 22.021(a)(1)(A)(ii), (a)(2)(A)(v), (a)(2)(B), (f)(2).

### 2. Application

Appellant acknowledges that the statute does not define "in concert." Appellant and the State both agree that being "in concert" can be generally defined as "an agreement in design or plan" or a "union formed by mutual communication of opinion and views." *See Arredondo v. State*, 270 S.W.3d 676, 680 (Tex. App.—Eastland 2008, no pet.) (defining "in concert). Using this definition, appellant argues that the record does not support the conclusion that he acted in concert with Majano or Tellez because he was not in the closet when they were sexually assaulting E.R. and the record does not indicate that he ever verbally encouraged the assault or facilitated the assault by restraining E.R.

However, a defendant's intent can be established by circumstantial evidence. *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). The present case contained sufficient circumstantial evidence to support the jury's finding that appellant acted in concert with Majano or Tellez, including but not limited to the following evidence:

- all four co-defendants arrived together in the same car to pick up the complainants;
- appellant and his co-defendants separated A.R. and E.R. prior to sexually assaulting them;
- appellant placed his penis inside A.R.'s vagina and anus in his room while Bryan and Jose simultaneously placed their penises inside E.R.'s mouth, vagina, and anus;
- appellant was aware that E.R. was in Bryan's room during the assault and could hear her being assaulted;

- appellant entered Bryan's room after hearing a knock on his door and then instructed E.R. to put Bryan's penis in her mouth;

- appellant kicked E.R. in the head when she pulled her head away from Bryan's penis;

- Daniel was in the room when appellant instructed E.R. to put Bryan's penis in her mouth;

- Daniel entered the closet after appellant ordered E.R. to put her mouth on Bryan's penis and made E.R. put her mouth on his penis;

- Jose and Bryan entered A.R.'s room together with their penises exposed and attempted to make her put their penises in her mouth;

- Bryan took the complainants' phones after the sexual assault and refused to return them;

- all four co-defendants drove the complainants away from the scene of the offense;

- the co-defendants made fun of the complainants after sexually assaulting them;

- all four co-defendants traveled to Walmart together to sell the complainants' phones.

In sum, the testimony established that all four co-defendants were working together to plan and execute the sexual assaults. They took turns with each complainant and often there were multiple co-defendants in the room together during the various assaults. Considering the evidence in the light most favorable to the verdict, we conclude that the evidence was legally sufficient to support the jury's finding that appellant acted in concert with the co-defendants by planning the sexual assault in advance and working together with the co-defendants to achieve their common goal. We overrule appellant's fourth issue.

**B.      False DNA evidence and prosecutorial misconduct**

In his first and second issues, appellant argues that the trial court erred by

failing to grant his motion for new trial because: (1) the State presented false DNA evidence at trial; and (2) the state committed prosecutorial misconduct by (a) not disclosing the underlying DNA testing records, and thus violating its *Brady* obligations; and by (b) failing to provide actual notice of its intent to introduce evidence of extraneous offenses. We will address these claims separately. These arguments pertain to all three of the underlying convictions.

### 1. False DNA evidence claim

#### a. Standard of review and applicable law

An appellate court reviews a trial court's ruling on a motion for new trial for an abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). Under this standard, the reviewing court must view the evidence in the light most favorable to the trial court's ruling, and only reverse if no reasonable view of the record could support the court's ruling. *Id.*

Generally, to preserve error for appellate review, the record must show that a complaint was made known to the trial court by a timely request, objection, or motion with sufficient specificity to make the trial court aware of the complaint. *See* Tex. R. App. P. 33.1(a)(1). The defendant must also show that the trial court ruled on the objection or that the defendant objected to the trial court's refusal to rule on the objection. *See* Tex. R. App. P. 33.1(a)(2).

#### b. Application

Appellant's motion for new trial did not allege that the State presented false DNA evidence at trial. Instead, appellant asserts that the issue was preserved for appellate review because it was discussed during the hearing on the motion for new trial. However, although the issue was discussed, appellant never clearly raised this objection to the trial court for a ruling nor did the trial court rule on the issue. *See*

10

Tex. R. App. P. 33.1(a)(2); *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) ("As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."). Because appellant's trial objections do not comport with the issue he raises on appeal, we conclude that appellant has failed to preserve this issue for appellate review. *See* Tex. R. App. 33.1. We overrule appellant's first issue.

## 2. Prosecutorial misconduct

In his second issue, appellant complains of prosecutorial misconduct, alleging the State violated its *Brady* violations by not giving him the underlying DNA data and by not giving him actual notice of the extraneous offenses it intended to introduce at trial.

### a. Applicable law

"Under Brady, nondisclosure of favorable evidence violates due process only if it is 'material' to guilt or punishment." *Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App. 2011) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Evidence is material to guilt or punishment 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

"*Brady* and its progeny do not require prosecuting authorities to disclose

exculpatory information to defendants that the State does not have in its possession and that is not known to exist." *Pena*, 353 S.W.3d at 810. Similarly, the State does not have such a duty if the defendant was actually aware of the exculpatory evidence or could have accessed it from other sources. *Id.*

### b. False DNA evidence

We first note that contrary to appellant's assertion, appellant's expert did not identify any actual errors in the original analysis of the DNA in appellant's case or reveal any benefit that would have accrued to appellant if the data generated from the DNA analysis had been turned over to him. Instead, appellant's expert testified that based on a new DNA analysis using Bryan's recently-acquired DNA sample, the testing shows that it was more likely that the DNA evidence recovered from E.R.'s genitals was deposited by Bryan and equally likely that the DNA evidence recovered from E.R.'s underwear was left by either Bryan or appellant. Because the State was not in possession of Bryan's DNA sample, the conclusions of appellant's DNA expert were largely based on data that was not available to the State at the time of trial. The new analysis performed by appellants' DNA expert also supports the State's theory that appellant caused E.R. to have sexual contact with Bryan. Thus, there was no *Brady* violation relating to the analysis of Bryan's DNA. *See id.*

Appellant also complains that the State did not give him the entire 850 pages of DNA testing records regarding his results; he claims that having such data would have allowed him to better rebut the State's theory of the case. However, before trial, appellant was given the lab reports that summarized all the data, and he was given the technician's conclusions that appellant could be excluded from the majority of the DNA comparisons with E.R. In the two instances that appellant could not be excluded as a possible donor—the sample from the towel and from

12

E.R.'s genitals—the data appellant was given only offered limited support for the proposition that appellant was the contributor of the DNA associated with E.R. Appellant was already aware of that information and made that argument at trial. Therefore, we cannot conclude that had the 850 pages of the underlying DNA data been given to appellant, the result of the proceeding would have been different. *See Ex parte Reed*, 271 S.W.3d at 727. Accordingly, the evidence was not material, and there was no *Brady* violation regarding the underlying DNA data.

### c. Lack of notice of extraneous offenses

On appeal, appellant argues that the trial court erred by failing to grant his motion for new trial because he never received actual notice of which extraneous offenses the State intended to introduce at trial. However, appellant's motion for new trial makes no mention of the State's alleged evasion of notice requirements. During his closing argument at the hearing, appellant claimed that the State gave insufficient notice of its allegations against him, but he never explained why this purported notice violation entitled him to a new trial. *Keeter*, 175 S.W.3d at 760. And the trial court never ruled on this objection. Therefore, we conclude that appellant has failed to preserve this issue for appellate review. *See* Tex. R. App. 33.1.

In summary, we conclude that appellant did not preserve his claim of lack of actual notice for appellant review. Additionally, we conclude that there were no *Brady* violations concerning the DNA evidence. Accordingly, we overrule appellant's second issue.

## C. Ineffective assistance of counsel

### 1. Applicable law

Both the federal and state constitutions guarantee an accused the right to

13

assistance of counsel. U.S. Const. amend. VI; Tex. Const. art. 1, § 10 (Tex. Official). This right necessarily includes the right to reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986) (applying *Strickland* standard to ineffective-assistance claims under Texas Constitution). To prevail on his claims of ineffective assistance of counsel, appellant must prove (1) counsel's representation fell below the objective standard of reasonableness and (2) there was a reasonable probability that, but for counsel's deficiency, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687–88; *Hernandez*, 726 S.W.2d at 55. In considering an ineffective-assistance claim, we indulge a strong presumption that counsel's actions fell within the wide range of reasonable professional behavior and were motivated by sound trial strategy. *Strickland*, 466 U.S. at 689; *Duncan v. State*, 717 S.W.2d 345, 347–48 (Tex. Crim. App. 1986).

To evaluate the effectiveness of counsel's performance, we look at the totality of the representation. *See Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Any claim for ineffectiveness of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *See Thompson*, 9 S.W.3d at 814. Because "the record is generally underdeveloped," direct appeal is usually an inadequate vehicle for claims of ineffective assistance of counsel. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012). For that reason, "we commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005).

## 2.     Application

In his third appellate issue, appellant argues that he received ineffective assistance of counsel because his counsel failed to: (1) retain a DNA expert and failed to gather and review the lab files; (2) object to the State's untimely motion to consolidate the three cases tried; (3) object to the State's allegedly improper notice of extraneous offenses; and (4) thoroughly investigate and prepare mitigation evidence. This argument relates to all 3 of his underlying convictions.

We note that in his motion for new trial, appellant did not raise the second and third rationales mentioned above; he only specifically raised the first and fourth rationales—failing to retain a DNA expert and failing to thoroughly prepare mitigation evidence. At the hearing on his motion for new trial, the second and third rationales were hardly discussed; accordingly, the record is generally underdeveloped regarding his trial counsel's strategic motives for not objecting to the State's motion to consolidate and not objecting to the State's notice of the extraneous offenses.

### a.     Failure to retain a DNA expert

Appellant's first claim of ineffective assistance of counsel asserts that his trial counsel was deficient by failing to retain a DNA expert. At the hearing, appellant's trial counsel testified that based on his experience of trying cases with DNA evidence, he felt sufficiently well-versed in DNA evidence to interpret the DNA results and explain them to the jury. He further explained that he was concerned that if he hired a DNA expert, it could open the door for the State to admit evidence showing that appellant assaulted a third juvenile just two weeks before the assault of A.R. and E.R. While that extraneous evidence was introduced eventually in the punishment phase, the State was prevented from introducing that evidence during the guilt/innocence stage of trial.

Appellant claims that a DNA expert could have been able to analyze the data and present evidence that Bryan was the source of the DNA associated with E.R., not appellant. However, the record does not reflect that Bryan's DNA profile was available before trial; in fact, the record gives no indication of when Bryan's DNA profile became accessible. Additionally, evidence that Bryan was the source of the DNA found on E.R.'s underwear and genitals still supports the State's theory because appellant was charged with causing E.R. to have sexual contact with Bryan. We cannot conclude that appellant's trial counsel was deficient for failing to retain a DNA expert in this case.

### b.  Failure to object

We have previously concluded that there are legitimate reasons for not wanting to sever criminal cases. *See Adekeye v. State*, 437 S.W.3d 62, 72 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (concluding trial counsel was not ineffective for failing to sever cases because trying the cases separately would give the State "two shots of getting a guilty verdict"). Because we can assume a strategic motive, we cannot conclude that appellant's counsel was ineffective for failing to object to the State's motion to consolidate.

Regarding appellant's complaint that his trial counsel failed to object to the State's allegedly improper notice of extraneous offenses, appellant has not demonstrated a reasonable probability that, but for counsel's alleged deficiency, the result of the proceeding would have been different. The extraneous offenses of which appellant complains are merely the acts the State alleged appellant committed during the underlying offense. Appellant received notice of the alleged facts through the indictments. There is no evidence suggesting that appellant was surprised by the evidence at trial or generally unaware of the offenses alleged against him. We cannot conclude that appellant's trial counsel was ineffective for

16

failing to object to the State's notice of extraneous offenses.

### c.     Failure to prepare mitigation evidence

Appellant lastly argues that his trial counsel was deficient for failing to adequately prepare mitigation evidence; specifically, appellant asserts that his counsel waited too long to hire a mitigation expert, which led to the expert not having sufficient time to find relevant mitigation evidence. The mitigation expert testified that although she typically prefers to begin mitigation work on a case one year before trial begins, she was hired to work on appellant's case three days before trial. Thus, appellant claims she was unable to conduct an adequate risk assessment, discover evidence of appellant having a potential learning disability, or find out why appellant had dropped out of school.

However, regardless of how late the mitigation expert was hired, mitigation evidence was still presented at trial through appellant's mother, girlfriend, aunt, and stepfather. They collectively testified that appellant was negatively affected by his parents' divorce, that appellant moved a lot as a child and was often bullied, appellant's school requested that he be tested for a learning disability while he was in the sixth grade but his mother refused and so he was never tested, appellant is currently the caring father of a five-month-old baby, and that he is a hard worker. Nothing in the record suggests that the result of the proceeding would have been different had the mitigation expert been hired earlier in the case; therefore, we cannot conclude that appellant's conduct was deficient concerning the mitigation expert. *See Strickland*, 466 U.S. at 687–88.

In summary, appellant has not demonstrated that his counsel's representation fell below the objective standard of reasonableness and that but for counsel's alleged deficiencies, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687–88. We overrule appellant's third issue.

17

### III.   CONCLUSION

We affirm the judgment of the trial court as challenged on appeal.

/s/      Charles A. Spain
        Justice

Panel consists of Justices Jewell, Spain, and Wilson.

Do Not Publish — Tex. R. App. P. 47.2(b).